IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACOB DANESHRAD, JOSEPH DANESHRAD, HASSAN BLURFRUSHAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 20 C 3887 |
| v. | ) ) ) | Judge Jorge L. Alonso |
| TREAN GROUP, LLC, NANCY STUBENRAUCH, MARK FRANTZ, and DOES 1 to 100, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this diversity case, three commodities traders, plaintiffs Joseph Daneshrad, Jacob Daneshrad, and Hassan Blurfrushan, assert several claims against their introducing broker, Trean Group, LLC, and two Trean employees, Nancy Stubenrauch and Mark Frantz. Plaintiffs' claims arise out of Trean's termination of its relationship with plaintiffs in December 2018. Defendants move for summary judgment on all claims, pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the motion is granted.

**BACKGROUND**

The following facts come from the parties' Local Rule 56.1 statements and responses and the associated exhibits. They are either undisputed or presented from the point of view of plaintiffs, the non-moving parties.

Plaintiffs Joseph Daneshrad and Jacob Daneshrad are investors with more than fifteen years' experience trading futures options. In 2018, seeking a new brokerage firm, they received an inquiry from defendant Mark Frantz, a salesman for defendant Trean Group, LLC ("Trean").

Trean is a full-service brokerage firm that provides independent introducing broker services. As an introducing broker, Trean connects investors with futures commissions merchants ("FCMs"), who execute trades for the investors on the Chicago Mercantile Exchange. Trean receives a share of the commission on each trade placed by a customer it introduces, but it is responsible to the FCM (which is in turn responsible to the exchange) for any trading losses the customer incurs.

Among the commodities traded on the Chicago Mercantile Exchange ("CME") are Standard & Poor's ("S&P") 500 futures contracts.[1] The Daneshrads were interested in trading

---

[1] In a recent opinion, Judge Seeger explained the mechanics of commodity futures trading as follows:

> A commodity futures contract is an agreement to buy or sell a commodity at a specific price on a specific date. Each side of the contract basically makes a bet about the future price of a commodity. Buyers and sellers place their trades through registered brokers [including FCMs such as FCStone International, Inc.], who in turn execute the trades with a futures clearinghouse [such as CME]. *See ADM Investor Services, Inc. v. Collins*, 515 F.3d 753, 756 (7th Cir. 2008). The clearinghouse serves as the middleman: it is the buyer to each seller, and the seller to each buyer. *Id.*
>
> Commodity futures traders must put money down as a deposit with their brokers. Known as "margin," this deposit represents "only ... a fraction of the actual cost on a trade." *Capital Options Investments, Inc. v. Goldberg Bros. Commodities*, 958 F.2d 186, 188 (7th Cir. 1992). "Margins in the futures markets are not down payments like stock margins, but are performance bonds designed to ensure that traders can meet their financial obligations." *See Economic Purpose of Futures Markets and How They Work*, U.S. Commodity Futures Trading Commission, https://www.cftc.gov/ConsumerProtection/ EducationCenter/economicpurpose.html (last visited Jan. 10, 2020). Margin helps protect brokers from holding the bag when the traders suffer losses. *See In re MF Global Inc.*, 531 B.R. 424, 435 (Bankr. S.D.N.Y. 2015) ("Margin is a security deposit to insure that futures commission merchants have adequate customer funds to settle open positions and is required by brokerage houses and exchanges to assure their own financial integrity and the financial integrity of the entire market place.") (quoting *Friedman v. Dean Witter and Company, Inc. et al.*, 1981 WL 26050, at *1 Nov. 13, 1981).
>
> Traders can buy positions worth many times more than the margin they have deposited. But if the value of the positions declines, the broker can demand more margin from the trader to protect itself against the risk of loss. *See ADM Investor Services*, 515 F.3d at 756. Traders must provide enough margin so that "short-term price movement[s]" on the futures contracts won't wipe out their account balances. *Id.* Margin reduces the risk posed by

naked S&P 500 futures options.[2] Frantz spoke with the Daneshrads about the possibility of connecting them, via Trean, with an FCM, FCStone International, Inc. ("FCStone"). He informed them that their accounts would have to be margined according to the CME framework known as "SPAN," which stands for "standard portfolio analysis of risk." Additionally, Frantz explained that FC Stone's risk department analyzed each day's trading, and, depending on the price of the underlying commodity and the level of volatility in the market, FC Stone sometimes required its customers to adjust their positions to reduce the risk they presented to the firm, even if SPAN margin requirements were met. Frantz also requested the Daneshrads to provide a statement from one of their former FCMs, as a sample of their trading, for him to pass along to FC Stone.

After FC Stone reviewed the prior trading statement, it approved opening new accounts for the Daneshrads and their trading partners, who included plaintiff Hassan Blurfrushan, William

---

default, particularly given that a "futures contract is executory; no asset changes hands when the contract is formed." *Id.* (citation omitted).

The clearinghouse settles the trades between buyers and sellers, and sets the minimum margin requirements for all futures contracts. *Id.* The brokers, in turn, are responsible to the clearinghouse for the trades. If a trader suffers losses that it cannot pay, the broker must pay the clearinghouse from its own funds. *Id.* ("The futures commission merchant then is on the hook, for it is a condition of participation in these markets that each dealer guarantee customers' trades."). To protect themselves, brokers enter into contracts with their customers that impose margin requirements and entitle the brokers to liquidate the customers' positions when necessary.

*Ironbeam, Inc. v. Papadopoulos*, 432 F. Supp. 3d 769, 773-74 (N.D. Ill. 2020); *see also* Roberta Romano, *A Thumbnail Sketch of Derivative Securities and Their Regulation*, 55 Md. L. Rev. 1, 10-12 (1996); David J. Gilberg, *Regulation of New Financial Instruments Under the Federal Securities and Commodities Laws*, 39 Vand. L. Rev. 1599, 1604-05 (1986) (both describing development of financial futures contracts trading in commodities markets).

[2] "An option is a contract that gives the owner the right to buy or sell an asset at a specified price (termed the exercise or strike price) on or before a specified future date." Romano, 55 Md. L. Rev. at 40; *see also U.S. Commodity Futures Trading Comm'n v. Garofalo*, No. 10-CV-2417, 2011 WL 4954082, at *2 (N.D. Ill. May 5, 2011) (concerning S&P 500 futures option contracts). A "naked" option is one in which "the writer does not own the commodity or an offsetting futures contract." Jerry W. Markham and David I. Gilberg, *Stock and Commodity Options—Two Regulatory Approaches and Their Conflicts*, 47 Albany L. Rev. 741, 757 (1983); *see id.* at 757 n. 90 (describing "hazards of dealing in naked options," as "outlined by a House Report at the time of the enactment of the [Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389]").

Josephson, and Emil Daneshrad. Plaintiffs and their trading partners opened four accounts with FC Stone, depositing a combined sum of $1,020,000. Joseph Daneshrad ultimately made all the trading decisions for all four accounts.

On at least five occasions between October 9, 2018, and December 24, 2018, plaintiffs' accounts were on margin calls (*i.e.*, FC Stone had directed plaintiffs to deposit additional funds to continue trading) or FC Stone asked Joseph to adjust plaintiffs' positions to reduce risk. Trean, through Frantz or defendant Nancy Stubenrauch, one of Trean's managing partners, emailed Joseph on October 11, 2018, November 12, 2018, November 26, 2018, December 11, 2019, and December 20, 2018, about margin or risk issues. Joseph typically handled the margin/risk issues not by depositing additional funds but by contacting FC Stone's risk department to learn how he could adjust his positions to stay within FC Stone's risk parameters. Frantz and Stubenrauch often emailed Joseph not only to inform him of margin or risk issues, but also to follow up by asking him to inform them as to what he had done to address them. Joseph became frustrated with Trean's insistence on staying "in the loop" because, from his point of view, Trean was merely an "intermediary" that was not participating constructively in helping Joseph adjust plaintiffs' positions to satisfy FC Stone's risk requirements. (*See* Defs.' LR 56.1 Stmt. Ex. 5, Joseph Daneshrad Dep. at 140:7-20, ECF No. 59-5.) Trean, for its part, became frustrated with Joseph's reluctance to keep Trean informed (*see id.* Joseph Daneshrad Dep. Ex. 12, Dec. 11, 2018 Email from Frantz to Daneshrads, ECF No. 59-5 at 123), despite the fact that, as the introducing broker, Trean was liable to FC Stone for any debit plaintiffs' accounts might run.

Following the December 20, 2018 margin call, the tension between Joseph and Trean began to boil over. The S&P 500 lost about 13% of its value between December 3 and December 22. On December 22, 2018, Frantz emailed Joseph about the margin call, frustrated that it was still

outstanding two days later: "[Y]ou said you would take care of this through Ray [in FC Stone's risk department] but you do nothing [and] now you're on a 2 day call which is a CFTC violation. . . . Two things[.] First, you will respond to US, not Ray[,] because Trean is on the hook for your business. Second: we are meeting Monday to discuss whether or not to keep your business." (*Id.* Ex. 1, Stubenrauch Decl. Ex. G, ECF No. 59-1 at 240.) Joseph responded by disputing the validity of the margin call, contending that it was based on an incorrect calculation, and stating that he had made some adjustments the previous day and would make more on the following business day. He concluded, "[W]e are not pleased with the way we are being treated by Trean. So, don't bother having a meeting Monday. We are going to move our accounts." (*Id.*)

The following week, on December 28, 2018, Frantz sent an email to Joseph and Jacob apologizing for the fact that they "have been unhappy with [their] treatment," but explaining that "Trean is [financially] responsible for [plaintiffs'] accounts," as with "all accounts [Trean] introduce[s]." (Pls.' LR 56.1 Stmt. of Add'l Facts Ex. 100, Joseph Daneshrad Aff. Ex. E, ECF No. 66 at 33-34.) He explained, based on his conversations with compliance and risk personnel at FC Stone, how and why FC Stone was making the margin calls and asking for the risk adjustments that had frustrated Joseph, and he provided certain options plaintiffs could take if they remained unhappy. He recognized that plaintiffs could move their accounts, but cautioned them to speak with compliance personnel at other FCMs first and suggested that they might find that "the margin and risk treatment is the same." (*Id.* at 34). Later that same afternoon, Frantz and Joseph had a long phone conversation, and Joseph recalls that he agreed to stay with Trean.

However, on December 31, 2018, Frantz sent an email to Kevin Brennan at FC Stone informing him that Trean was planning to ask Joseph Daneshrad to move plaintiffs' accounts to another brokerage, although Trean had no problem with FC Stone "dealing directly with Joseph"

5

if it was "comfortable" keeping his business. (Stubenrauch Decl. Ex. I, ECF No. 59-1 at 248.) Brennan responded that he would raise the matter with his colleagues, but he was personally inclined to "let [plaintiffs] go." (*Id.*) Later that afternoon, Frantz sent an email to Joseph and Jacob informing them of Trean's decision: "I had a call with the partners today and we have decided it's in everyone's best interests for you to find a new home for all four accounts. I have notified FC Stone that Trean is ending this relationship and that Trean would be okay with the possibility of you continuing to clear FC Stone, removing Trean as the introducing Broker." (*Id.* Ex. J, ECF No. 59-1 at 255.)

Although Trean had expressed no opposition to FC Stone working directly with Joseph, FC Stone ultimately decided not to keep plaintiffs' business. Joseph claims that an FC Stone representative explained to him in a phone conversation that FC Stone feared that it would damage Trean's trust in FC Stone if FC Stone continued to work with investors who had been brought in by Trean. On January 2, 2019, Brennan informed Joseph and Jacob via email that FC Stone had put plaintiffs' accounts on "liquidation only" status. Jacob responded that it would take some time to transfer the accounts, and he asked if FC Stone would consider enabling plaintiffs to trade so they could "buy protections" until they were able to complete the transfers. (*Id.*, ECF No. 59-1 at 252.) FC Stone agreed to "turn off the liquidation only setting and set the margin on the trading platforms to 150% to allow a little maneuverability within the accounts." (*Id.*, ECF No. 59-1 at 251.) However, Ray Ryan, the FC Stone risk manager Joseph had been dealing with, warned Jacob that "this should not be used to establish new risk within the accounts." (*Id.*)

Plaintiffs claim that they could not immediately transfer their positions to another broker, due to the red tape associated with opening new accounts. Further, given their reduced ability to "freely maneuver and adjust their positions" combined with the recent downward trend in the S&P

500, they feared that they would lose even more money if they did not take swift action. (Defs.' LR 56.1 Resp. ¶ 23, ECF No. 70.) As a result, plaintiffs decided to liquidate their positions right away, rather than buy protection. This left them with approximately $572,000 of the $1,020,000 they started with, a loss of approximately $548,000.

The market began to rebound, and by the end of January 2019, the value of the S&P 500 was down only 5% since December 3, 2018. By the end of February, it had returned approximately to its December 3, 2018 level. Plaintiffs claim that, if they had been allowed to continue trading without restrictions, they would have been able to "ride out the storm by adjusting their positions and gain all of their losses back," although they do not explain precisely how they would have altered their positions as they stood at the time. (*Id.* ¶ 25; *see* Daneshrad Dep. at 158:15-161:10.) This suit followed.

## LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (internal quotation marks omitted). "To defeat a motion for summary judgment, the party opposing it must make a 'showing sufficient to establish the existence of [any challenged] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Johnson v. Advoc. Health & Hosps.*

*Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). The court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

In assessing the evidence at summary judgment, the court must consider the facts in the light most favorable to the non-moving party, giving that party "the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," regardless of whether it can "vouch for the objective accuracy of all" the evidence the non-moving party puts forward. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014). Even though district courts must view the non-moving party's evidence in this generous light, it does not follow that they are "required to draw every requested inference; they must only draw reasonable ones that are supported by the record." *Omnicare*, 629 F.3d at 704. "Inferences supported only by speculation or conjecture will not suffice." *Johnson*, 892 F.3d at 894.

## **ANALYSIS**

Plaintiffs' first amended complaint asserts the following claims: (1) defendants breached their fiduciary duty to plaintiffs by terminating their relationship at a time when plaintiffs were vulnerable based on the low value of their positions, (2) defendants intentionally interfered with plaintiffs' prospective economic advantage by terminating their relationship with plaintiffs, which prevented plaintiffs from being able to trade futures options via FC Stone as expected; (3)

8

defendants were negligent in terminating their relationship with plaintiffs based on a faulty risk assessment that did not meet the standard of care; (4) defendants defrauded plaintiffs by promising they would not increase margin and risk requirements and would give plaintiffs adequate time to address margin and risk issues; (5) defendants defrauded plaintiffs by concealing that they had terminated relationships with other naked futures options sellers whose trading they deemed too risky and that they might do the same to plaintiffs; and (6) defendants fraudulently and (7) negligently misrepresented, after reviewing a sample of plaintiffs' past trading activity, that they were comfortable with plaintiffs' trading habits. The parties appear to agree that Illinois law applies. Defendants seek summary judgment on all claims.

Defendants argue that plaintiffs cannot prove all of the elements of any of these claims, and, in their briefs, they persuasively describe various elements as to which plaintiffs have not come forward with sufficient evidence. (*See* Defs.' Mem. at 15-20, ECF No. 58; Defs.' Reply at 8-15, ECF No. 69.) The Court agrees that there are multiple elements of each claim that plaintiffs cannot prove, but the Court need not trace each missing element individually because all of plaintiffs' claims share one common element that is lacking. Under Illinois law, "[a]n essential element of a plaintiff's cause of action for any tort is the existence of a proximate causal relationship between the act or omission of the defendant and the damages that the plaintiff has suffered." *Garland v. Sybaris Clubs Int'l, Inc.*, 141 N.E.3d 730, 760 (Ill. App. Ct. 2019). Thus, plaintiffs' breach of fiduciary duty, negligence, and various fraud and misrepresentation claims all require plaintiffs to demonstrate that defendants' actions or omissions proximately caused plaintiffs' losses. Plaintiffs, however, cannot demonstrate that defendants' alleged misconduct—namely, the termination of Trean's relationship with plaintiffs and the misrepresentations and

9

misleading omissions defendants are alleged to have made—proximately caused the financial losses that plaintiffs suffered when they decided to liquidate their accounts.

To briefly reiterate the relevant facts, the events that led to the liquidation of plaintiffs' accounts were as follows: Joseph Daneshrad told Frantz and Stubenrauch via email that he intended to transfer plaintiffs' accounts elsewhere; even after Joseph told Frantz that he had changed his mind, Trean discussed the matter internally and, based on the volatility in the market, the way Joseph had handled the margin calls and requests for risk adjustments, and the "whole scenario with the lack of communication," Trean concluded that "it just wasn't a good relationship" (Defs.' LR 56.1 Stmt. Ex. 11, Stubenrauch Dep., ECF No. 59-11 at 79:3-4, 42:9-10); Trean informed Joseph and Jacob that it was ending its relationship with them, although it had no objection to plaintiffs continuing to work with FC Stone; FC Stone decided not to retain plaintiffs' business, and it put plaintiffs' accounts on "liquidation only"; Jacob asked FC Stone to enable trading so plaintiffs could manage their existing positions by "buy[ing] protections"; and FC Stone agreed to "turn off the liquidation only setting and set the margin on the trading platforms to 150% to allow a little maneuverability within the accounts," but not to allow plaintiffs to "establish new risk within the accounts" (Stubenrauch Decl. Ex. J, ECF No. 59-1 at 251-52). At that point, *plaintiffs*—not Trean or FC Stone—decided to liquidate their accounts rather than manage their existing positions, transfer their accounts to a new broker, or just let their positions expire. It is undisputed that the market rebounded by the end of February 2019, and plaintiffs' largest losing positions did not expire till March and May 2019. (Pls.' LR 56.1 Resp. ¶ 57, ECF No. 68) (citing Stubenrauch Decl., Ex. C, Pls.' Jan. 2019 FC Stone Account Statement, ECF No. 59-1 at 202-213).) Thus, it appears that plaintiffs could have avoided their losses simply by waiting for their positions to expire, rather than rushing to liquidate.

There is no evidence that anyone at Trean or FC Stone directed plaintiffs to liquidate their accounts within any specific time frame, rather than wait until their existing positions expired, nor were plaintiffs prohibited from making risk-reducing trades. In fact, the evidence is to the contrary. (*See* Stubenrauch Dep. at 43:25-48:12). According to Stubenrauch, Trean was waiting for instructions from plaintiffs with respect to transferring or otherwise managing plaintiffs' accounts (*id.* at 49:14-17), according to its usual practice of working "hand-in-hand" with investors "to allow them to manage their positions" while transfer or liquidation is pending (*id.* at 48:7-12). Plaintiffs cite no contrary evidence. Further, Joseph Daneshrad appeared to admit at his deposition that plaintiffs had the option of waiting till their positions expired, and plaintiffs simply decided against it because they wanted to be able to trade freely, rather than have to "sit and wait." (Joseph Daneshrad Dep. at 161:22-162:2.) He also appeared to admit that plaintiffs "would [have been] okay" if they could have "waited one week later," when the market began to "stabilize or come back . . . just a week later." (*Id.* at 160:8-12.) Plaintiffs have not shown why they could not, indeed, have simply waited a week before taking the drastic action of liquidating their positions.

The closest plaintiffs come in this regard is to assert that the increased 150% margin requirement required them immediately to wire in an amount in excess of $40,000, which they did not have immediately available. But there is no evidence that anyone at Trean or FC Stone directed plaintiffs to wire in more money or otherwise indicated that the 150% margin requirement applied to plaintiffs' existing positions. The only evidence at all on this point is Joseph Daneshrad's affidavit, and he does not state that anyone at FC Stone or Trean told him that plaintiffs were required to deposit additional funds; it appears that this is merely his own subjective belief, which, if so, amounts to mere speculation. *See In re Cohen,* 507 F.3d 610, 614 (7th Cir. 2007) ("speculation is not evidence"); *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008) (a

11

"hunch" is not sufficient to survive summary judgment). Even if he is correct that he had to deposit additional funds immediately (and again, there is no direct evidence of it), his representation that he lacked access to the necessary funds is contradicted by the account applications submitted to FC Stone. In his application, Joseph represented that he had between $500,000 and $1,000,000 in current liquid assets, and the application materials showed that Jacob had between $100,000 and $250,000 in current liquid assets, Emil had between $1,000,000 and $5,000,000 in current liquid assets, Blurfrushan had between $500,000 and $1,000,000 in current liquid assets, and Josephson had between $500,000 and $1,000,000 in current liquid assets. (Stubenrauch Decl. Ex. B, ECF No. 59-1 at 22, 26, 71, 113, 162.) In addition, the same documents showed that the net worth of each investor was between $1,000,000 and $5,000,000, apart from Jacob, whose net worth was between $500,000 and $1,000,000. Plaintiffs cannot be heard to claim now, based only on Joseph's bare affidavit, that they could not have come up with a little more than $40,000 if they had needed it in order to protect a further $548,000. And on top of all that, even if by some chance it is true that plaintiffs could not have come up with the money, they do not address the possibility that they could have reduced the required margin, in dollar terms, by executing risk-reducing trades, as Joseph had already done numerous times.

To conclude that Trean is liable for the losses that followed from the liquidation of plaintiffs' account, plaintiffs must prove that Trean's actions or omissions were both the "cause-in-fact" and the "legal cause" of the liquidation and resulting losses. *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). To assess legal cause, courts ask whether the injury is foreseeable, *i.e.*, whether it is "the type of injury that a reasonable person would see as a likely result of his or her conduct, or whether the injury is so highly extraordinary that imposing liability is not justified." *Id.* (internal quotation marks omitted); *see also City of Chicago v. Beretta U.S.A. Corp.*, 821

N.E.2d 1099, 1127 (Ill. 2004) (defendant's conduct is a legal cause only if it is "so closely tied to the plaintiff's injury that he should be held legally responsible for it") (internal quotation marks omitted). Plaintiffs do not explain, and the Court fails to see, how or why a reasonable jury could conclude that defendants should have foreseen that the likely result of Trean's actions or omissions would be that plaintiffs, who were experienced futures options traders, would decide immediately to liquidate their accounts at a significant loss, rather than wait—taking protective measures to reduce risk if necessary—till they could transfer their positions to another broker or until their pending positions expired. *See First Springfield Bank & Tr. v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999) ("The question is whether it was reasonably foreseeable that violating a "no parking" sign at mid-block [and thereby blocking a pedestrian's view of the roadway] would likely result in [the] pedestrian's ignoring a marked crosswalk at the corner, walking to mid-block, and attempting to cross a designated truck route blindly and in clear violation of the law. Clearly, it would not. **[*Plaintiff's*] *decision* to jaywalk, *while undeniably tragic and regrettable, was entirely of her own making*.** [Defendants] neither caused [her] to make that decision, nor reasonably could have anticipated that decision as a likely consequence of their conduct.") (emphasis added); *see also Wilson v. Michel*, 586 N.E.2d 333, 337 (Ill. App. Ct. 1991) (plaintiff's "voluntary" act "was a subsequent intervening act not proximately caused by" the defendant's actions). Plaintiffs have not provided any coherent explanation for why the circumstances surrounding Trean's termination of its relationship with plaintiffs forced them to liquidate their accounts right away, or why Trean should have foreseen that they would.

Finally, even if the Court were to accept that it was foreseeable under the circumstances that plaintiffs would abruptly liquidate their accounts, they make no serious effort to explain or adduce evidence showing, in a concrete, non-hypothetical way, what they would have done

13

differently if they had been able to trade without restrictions, or how it would have permitted them to avoid the losses they suffered. Plaintiffs suggest that, given the conditions prevailing in the market in late 2018 and early 2019, they would have traded freely if they had been able to do so, rather than "sit and wait" till their positions expired. (*Id.* at 161:22-162:2; *see also id.* at 158:15-161:10.) But they do not explain in any concrete detail what positions they would have taken instead, so the Court has no way of ascertaining whether they would have ended up better off. They are required to show that they would not have "suffered the same losses" even absent defendants' offending conduct, *see Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 748 (Ill. 1994), but in this regard what they offer is, at best, a "speculative theory" of causation. *Page v. Speedway Superamerica LLC*, No. 306-CV-039, 2007 WL 1138884, at *3 (N.D. Ind. Apr. 16, 2007). They must "present evidence creating a reasonable inference, not merely a possibility," as to all essential elements of their claims, *id.*, but they offer no more than a "hopeful hypothesis" that the trades they would have placed would have paid off, which cannot serve as a "substitute for proof," *Beaumont v. J.P. Morgan Chase Bank, N.A.*, 782 F. Supp. 2d 656, 663 (N.D. Ill. 2011) (internal quotation marks omitted).

Because summary judgment is "the put up or shut up moment in a lawsuit," *Springer*, 518 F.3d at 484, the non-moving party must "flesh out [its] theory with evidence; speculation will not do." *Avery v. Mapco Gas Prod., Inc.*, 18 F.3d 448, 453-54 (7th Cir. 1994). Plaintiffs have not fleshed out their theory with evidence, and, at the summary judgment stage, they were required to do more. Because plaintiffs do not show how Trean's actions or omissions proximately caused their losses, which appear instead to stem from a decision that was "regrettable" but "entirely of [plaintiffs'] own making," *Galman*, 720 N.E.2d at 1071, defendants are entitled to summary judgment.

Although the above discussion suffices to resolve the present motion, the Court makes one final, parenthetical note, lest this result seem harsh for plaintiffs. Plaintiffs devote the largest part of their brief to their breach of fiduciary claim, arguing that Trean had a responsibility as plaintiffs' broker to enable plaintiffs to keep trading as long as they were responsive to margin calls and risk issues, not to cause losses by "abandoning Plaintiffs in midstream." (Pls.' Resp. Br. at 4, ECF No. 64.) Because, as explained above, plaintiffs have not shown that defendants' actions caused their losses, it need not address this argument in detail, but it pauses to note that plaintiffs faced an uphill battle here. The Illinois Appellate Court has explained that "'[t]he duty of care owed by a broker carrying a nondiscretionary account is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer.'" *First Am. Disc. Corp. v. Jacobs*, 756 N.E.2d 273, 284-85 (Ill. App. Ct. 2001) (quoting *Index Futures Group, Inc. v. Ross,* 557 N.E.2d 344, 348 (Ill. App. Ct. 1990)); *see also Equity Tr. Co. Custodian f/b/o Jeffrey M. Wagner I.R.A. v. Windwrap, LLC*, 449 F. Supp. 3d 763, 776 (N.D. Ill. 2020); *Ironbeam, Inc. v. Evert*, 417 F. Supp. 3d 1031, 1041 (N.D. Ill. 2019). Plaintiffs cite no cases validly supporting their position that defendants breached any such duty here,[3] and if anything, the law seems to be to the contrary.

Plaintiffs cite *First American Discount Corp. v. Jacobs*, which is not directly on point, but, to the extent it has any bearing on this case, it partially illustrates the policy concerns weighing against plaintiffs' claims here. That decision explained that requiring a broker to refrain from liquidating a futures options trader's account even where, in the event of a market freefall, the account exposes the broker to potentially limitless losses "would necessarily be contrary to the

---

[3] Plaintiffs purport to cite cases supporting their position, but none of them are on point. (*See* Pls.' Resp. Br. at 5-6, ECF No. 64.) To the extent they are relevant at all, these cases stand for unremarkable propositions such as that brokers should operate in good faith, avoid self-dealing, and communicate to their customer any material information in their possession that might impact the customer's trading. Plaintiffs have not shown that defendants had ulterior motives for letting plaintiffs go or that they hid any material information from them, nor does that seem to be the crux of plaintiffs' claim, in any case.

federal regulatory scheme." 756 N.E.2d at 285. Applicable federal regulations, the court explained, are "'designed to afford merchants and commodities exchanges with maximum protection,'" which in turn protects the investing public. *Id.* at 280 (quoting *Moss v. J.C. Bradford & Co.*, 446 S.E.2d 799, 808 (N.C. 1994)); *see also Capital Options Investments*, 958 F.2d at 190 ("Margins are accorded a special status in the regulatory scheme of the Commodity Exchange Act so that futures commission agents are able to assure their own financial integrity, which, in turn, contributes to the financial integrity of the entire marketplace."); *ADM*, 515 F.3d at 757 ("[B]alky customers are not in the zone of interests protected by margin-posting requirements. Margin protects dealers and counterparties *from* defaulting customers, who are in no position to complain when the protection of their trading partners turns out to be incomplete."). Thus, when a broker makes a decision regarding a customer account because the customer is taking on too much risk, there are sound policy reasons why any claim that the action exposes the broker to liability should be subject to careful scrutiny.

In any case, as the Court has explained with respect to the element of causation, plaintiffs' claims do not hold up to scrutiny here. Plaintiffs have not come forward with sufficient evidence to permit a reasonable jury to find in their favor on an essential element of their claims, so defendants are entitled to summary judgment.

## CONCLUSION

Defendant's motion for summary judgment [57] is granted. Civil case terminated.

SO ORDERED.                                                 ENTERED: February 14, 2022

**JORGE L. ALONSO**
**United States District Judge**